# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 26, 2013 Session

## STATE OF TENNESSEE v. RUSSELL DEAN LONG AND JESSICA RENEE ADKINS

**Appeal from the Criminal Court for Washington County**
**No. 35192A, 35192B      Robert E. Cupp, Judge**

---

**No. E2012-01166-CCA-R3-CD - Filed September 27, 2013**

---

A Washington County jury convicted Russell Dean Long of first degree felony murder committed during the perpetration of aggravated child abuse and first degree felony murder committed during the perpetration of aggravated child neglect. The jury convicted Jessica Renee Adkins of first degree felony murder committed during the perpetration of aggravated child neglect. The trial court merged Defendant Long's convictions and sentenced both of the defendants to serve life in the Tennessee Department of Correction. On appeal, Defendant Long asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court allowed the introduction of inadmissible hearsay evidence through the videotaped conversation between the defendants; and (3) the trial court erred by failing to exclude an autopsy photograph of the victim. Defendant Adkins asserts that: (1) there is insufficient evidence to support her conviction; and (2) the trial court improperly overruled her objection to the State's use of a visual aid during closing arguments. After a thorough review of the record and applicable law, we conclude there exists no error in the judgments of the trial court. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Steve McEwen (on appeal), Mountain City, Tennessee and Jeffery C. Kelly and William Donaldson (at trial), Johnson City, Tennessee, for the appellant, Russell Dean Long.

James T. Bowman, Johnson City, Tennessee, and Donna M. Bolton, Johnson City, Tennessee, for the appellant, Jessica Renee Adkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney

General; Tony Clark, District Attorney General; and Erin McCardle, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION
## I. Background and Facts

This case arises from the death of a two-month old infant girl as a result of blunt force trauma. A Washington County grand jury indicted the victim's father, Defendant Long, for first degree felony murder committed during the perpetration of aggravated child abuse and first degree felony murder committed during the perpetration of aggravated child neglect. The grand jury also indicted the victim's mother, Defendant Adkins, for first degree felony murder committed during the perpetration of aggravated child neglect.

At the September 2011 trial on these charges, the parties presented the following evidence: Investigator Joe Harrah, a Johnson City Police Department officer, testified that he was involved in an investigation of the victim's death. At approximately 1:30 a.m. on March 6, 2009, a patrol supervisor instructed Investigator Harrah to report to the defendants' apartment located in Johnson City, Tennessee. When Investigator Harrah entered the apartment, he saw an infant, covered with a sheet, lying on the couch.

Investigator Harrah testified that he photographed the scene and then sat down in the kitchen of the apartment with the defendants to ask a few questions about the circumstances surrounding the victim's death. He said that Defendant Adkins did not speak much, but Defendant Long told him that the victim had been vomiting for a few days. Defendant Long said that Defendant Adkins told him she had called the victim's pediatrician on March 1, 2009, and was instructed to have the victim "looked at" if she did not improve. The couple took the victim to Dr. Ledes's office on Monday, March 2, 2009. The doctor told them the victim had a stomach virus and instructed the parents to give the victim Pedialyte. Defendant Long told the investigator that, on the day of her death, he fed the victim between 2:00 and 3:00 p.m. and laid her down to sleep at around 6:30 p.m. Defendant Adkins told Investigator Harrah that she returned home from work that day at around 10:00 p.m. and checked on the victim at around 11:30 p.m. Defendant Adkins recalled that the victim cooed when she touched her hair. Defendant Adkins said that she went into the victim's room again at around 1:00 a.m. and found the victim unresponsive.

Investigator Harrah testified that Defendant Long told him that the victim's last "well checkup" was on February 23, 2009, and the victim was "fine." Investigator Harrah reviewed a checklist of symptoms or illnesses with the couple, and they indicated that in the seventy-two hours before the victim died, she was lethargic and slept more than usual, was fussy, cried excessively, vomited, and had a decreased appetite. Investigator Harrah said that

he included all of this information in his police report, which was sent to pathology along with the autopsy report.

Investigator Harrah testified that he took a statement from Defendant Long that night while at the apartment. Defendant Long reviewed and signed the statement prepared by Investigator Harrah. Investigator Harrah read the statement for the jury as follows:

> I put [the victim] in her crib around 6:00 or 7:00 p.m. I went back and checked on her around 9:00 p.m., and she moved when I opened the door. She had a stomach virus earlier and we took her to Dr. Ledes at Johnson City Pediatrics and he said to keep giving [her] a bottle and Pedialyte. She wouldn't keep her formula [down] until the last two days and she was keeping it down good. [Defendant Adkins], my wife, came in from work at 11:00 p.m., and she checked on [the victim] and she came into the room and said that [the victim] was fine. [Defendant Adkins] said that [the victim] had cooed and smiled. [Defendant Adkins] got up around 1:00 a.m. or 1:30 a.m. and checked on [the victim]. I heard [Defendant Adkins] saying, ["]Oh, my God. Oh, my God, she's dead, she's dead.["] [Defendant Adkins] had her in her arms and laid her on the couch. I called 911 and they helped me try CPR till EMS got there.

Investigator Harrah said that, because Defendant Adkins was "distraught," he arranged to take a statement from her later that day.

Investigator Harrah testified that the defendants came to the police station during the afternoon of March 6, 2009, and Defendant Adkins gave a signed statement to police. Investigator Harrah read the following statement for the jury:

> About a week ago today, my baby, [the victim], started throwing up for no reason, that was a Friday, and she couldn't keep anything down over the weekend. She kept throwing up so I took her to Dr. Ledes. Dr. Ledes told us that [the victim] had a stomach virus and it would have to run its course. That was on Monday, the 2nd of March. On Tuesday morning, I fed [the victim] around 7:00 a.m. and laid her back in her crib and she slept until 5:00 p.m. I was concerned that she had slept that long and I called Dr. Ledes and he said that it was okay for her to sleep that long. [The victim] was fine up until last night. She kept her formula down really good and didn't throw-up anymore. I checked on her at 11:00 p.m. last night and she was fine. I went to feed her at 1:00 a.m. and that was when I found her not moving and cold. [Defendant Long] called 911 and tried CPR."

On cross-examination, Investigator Harrah testified that, when he rolled the victim over, he saw what appeared to be lividity, or the pooling of blood, on her back. He agreed that someone who had been dead for three or four hours might show more lividity than someone who had been dead for three or four minutes. Investigator Harrah stated that he also noted that the victim was beginning to "become rigid a little bit and stiffen a little bit."

On redirect examination, Investigator Harrah testified that, during the March 6, 2009, interviews, neither defendant ever mentioned their older child, Lilliana,[1] or a doctor's appointment involving Lilliana.

Terri Adams, a neighbor, testified that she lived in the unit behind the defendants' unit at the Edna Court apartments. She explained that, based on the proximity of the two apartments, she shared a wall with the defendants. Adams said she was familiar with the defendants' two children, Lilliana and the victim. She stated that she was unaware of any "health issues" related to the victim "[o]ther than the week that she died."

Adams recalled that, the Sunday before the victim died, the defendants were standing outside on the balcony and asked Adams to come over and look at the victim. Adams went into the victim's bedroom and, upon seeing her in the crib, "immediately" told Defendant Adkins that she needed to take the victim to see a doctor or the emergency room. Adams said that she could "immediately tell something was wrong" with the victim. Adams said that the victim "looked pale and concrete color, lifeless, I mean, not like a newborn should." Adams said that she tapped the victim's foot in an attempt to arouse her and found no response. She did this two more times and, on the third attempt, when she "flipped [the victim] pretty good," the victim "barely shrugged." In response to Adams's statement that the victim needed medical attention, Defendant Adkins said that she had already spoken with a doctor and that, if the victim was not showing improvement by 5:00 p.m., she would take the victim to the hospital. Adams said that she told Adkins, "No, you need to take her now, no if, ands or buts about it, take her now."

Adams testified that, later in the week, she prepared a bottle for her fiancé, Glen Rokicka, to take to the defendants' apartment to feed to the victim. She explained that her son had a milk allergy and required a special formula. She thought that might also be the case with the victim, so she prepared a bottle of the non-milk-based formula. When Rokicka returned, she observed "spit-up" all over his arm and shirt. After this incident, Rokicka and Adams spoke with Defendant Long and offered to watch Lilliana so that he could take the victim to the hospital. Defendant Long said that he could not take the victim to the hospital

_____

[1] The police reports, transcripts, and medical records all use both "Lillianna" and "Lilliana" in reference to the defendants' older child. For the sake of clarity, we will spell her name, "Lilliana."

because he did not have the victim's birth certificate. Adams said that she asked Defendant Long, "When was the last time you've been to the ER [and] they've asked you for a birth certificate?" Defendant Long gave no response.

Adams testified that Defendant Long had been staying with the children for a week or two while Defendant Adkins was at work. During this time, there were occasions when the music would be "extremely loud, not the tone you would have for two children in the house." She said that she would also hear the victim "crying a lot," not "a normal cry, not just an attention cry, it was unnerving."

On cross-examination, Adams testified that she told Defendant Adkins about hearing the victim "screaming and crying" while Defendant Adkins was at work. Adams said that she did not speak with Defendant Adkins after seeing the victim on the Sunday before her death. All subsequent conversations about the victim's health were with Defendant Long.

Glen Rokicka, Adams's fiancé and the defendants' neighbor, testified that he and Adams had a three-year-old child together. Rokicka said that, the week before the victim's death, Defendant Long stayed home and cared for the couple's two children while Defendant Adkins was at work. He also described hearing loud music coming from the apartment during this time and the sound of the victim crying a lot.

Rokicka testified that, several days before the victim's death, he took a four-ounce bottle of formula to the victim in the defendants' apartment. He fed the victim himself and did not notice anything unusual about her color or appearance. She drank the entire bottle, but "maybe ten seconds" after he removed the bottle from her mouth, she spit-up the formula. Rockicka said that he then told Defendant Long he needed to take the victim to the hospital because she was sick. He offered to care for Lilliana so that Defendant Long could take the victim for medical treatment. The Defendant said that he could not take the baby without proper identification and that Defendant Adkins would need to take the victim to the hospital.

Rokicka testified that both he and Adams spoke with Defendant Long "a few times after that" suggesting that he seek medical attention for the victim. He said the hospital was within walking distance of the apartment complex.

On cross-examination, Rokicka testified that he never spoke directly with Defendant Adkins about the victim needing medical care but that he told both defendants to take the baby to the hospital when he saw them coming and going from their apartment on the days leading up to the victim's death.

Rokicka testified that Investigator Harrah came to his apartment to discuss the

victim's death. Rokicka said that he could not remember everything he told Investigator Harrah that afternoon; however, he believed that he told the investigator about advising Defendant Long "numerous times to take the baby to the hospital." Rokicka said that he recalled reading and signing a statement for police but did not remember whether this information was in the statement. Rokicka agreed that Defendant Long may have told him that the reason he could not take the victim to the hospital was because he did not have the TennCare card for the victim.

Dr. Teresa Allen Campbell, a forensic pathologist, testified that she conducted an autopsy on the victim's body. During Dr. Campbell's examination of the victim, who was two months and three weeks old at the time of her death, Dr. Campbell found blunt force trauma to the victim's head "evidenced by occipital skull fractures of different ages (acute and healing) with bilateral subdural hemorrhages (histologic aging overall consistent with approximately 5 to 8 days with some areas appearing more acute) causing increased intercranial pressure, cerebral edema and death." Based upon her examination, Dr. Campbell concluded that the cause of the victim's death was blunt force trauma to the head and the manner of death was homicide. She explained that the victim died from head injuries but had additional injuries to her body consistent with a homicide rather than an accidental head trauma. The victim had injuries of "different ages" indicating multiple instances of trauma to the victim, which suggested intentional as opposed to accidental injury. Dr. Campbell stated that, in reaching her medical conclusions, she also considered the police reports and found the explanation for the injuries inconsistent with the injuries found during the autopsy.

Dr. Campbell testified that the victim suffered from bilateral subdural hemorrhages of the brain with small, scattered subarachnoid hemorrhages. Dr. Campbell said that, upon further examination, she determined that the subdural hemorrhages were five to eight days old. Dr. Campbell also found areas with more acute hemorrhage but could not estimate the age. Dr. Campbell testified that scattered subarachnoid hemorrhages are frequently associated with blunt force trauma. Dr. Campbell estimated that these injuries likely occurred around the same time as the subdural hemorrhages.

Dr. Campbell testified that the victim also sustained occipital skull fractures "of different ages" with one of the fractures extending onto the left parietal bone. Dr. Campbell determined that two of the fractures on the right occipital bone contained fibrous tissue and had started to heal. After microscopic examination, she confirmed that the fractures on the right were older than the fracture on the left side of the parietal bone. The fracture on the left side of the victim's skull showed no signs of healing. Dr. Campbell opined that this fracture could have occurred a couple of hours before death, but it was no more than one to two days old.

Dr. Campbell diagnosed the victim with cerebral edema, swelling of the brain, with neuronal cell death and gliosis. Dr. Campbell explained that there are brain cells, glial cells, that help support the brain and react when the brain is injured. Dr. Campbell found the presence of proliferating glial cells, gliosis, indicating that the victim's injuries were not "fresh." The brain had had "enough time" for reactive processes to begin in the brain.

Dr. Campbell testified that she found bilateral diffuse retinal and optic nerve sheath hemorrhages and hemorrhage of the spinal cord. Dr. Campbell said that the victim suffered four fractured ribs that were "about the same age," between seven to fourteen days old. Two other of the victim's ribs had "older" fractures, which the doctor described as older than fourteen days. The two older fractures were joined but were still in the process of healing.

The victim had pulmonary edema, fluid in the lung, a medical condition consistent with a neurologic event. Dr. Campbell said that she also made a non-specific finding of cardiac dilatation. She explained that this is a common progression before death when the heart is having trouble beating and getting oxygenated.

Dr. Campbell identified a photograph taken during the autopsy of bruising on the inside of the victim's scalp. She explained that the bruises were located on both sides of the victim's head but not "right over" the fractures. Dr. Campbell described the injuries depicted in the photograph as follows:

> The little lines are blood vessels. These little discreet red-purple areas are bruises or contusions. These would be from - bruises are from blunt trauma. There are no lacerations or cuts or anything on the outer surface of the head, so this was on the - this is the left and this is the right and I obtained there - you can see multiple small discreet bruises so the cause could have been multiple impacts with some small, some small object causing bruises or one object with multiple protuberances on it possibly, and these are different ages as well. . . . I did not sample each bruise, I got one section and this showed more healing, both of them were healing, they were not fresh, they had inflammation. The one on the right had more inflammation in the hemosiderin I was telling you about than the one on the left, and I have hemosiderin but it had inflammation. So there was some healing going on here but this older healing on the right side.

Dr. Campbell testified it was "unlikely" that the victim's injuries were caused by a bump on the edge of a bathtub or an eighteen-inch fall from a couch. She explained:

> Short-fall injuries do occur, they are rare. Children fall a lot and have no

-7-

significant brain injuries. So you can have significant injuries from short falls, even lethal injuries. What makes this case different really is that we have got more than one incident going on here. We've got two ages of rib fractures, we've got two ages of skull fractures, we've got older subdural hemorrhage and more fresh subdural hemorrhage, that's what makes it even more so not consistent with a single history of one fall.

Dr. Campbell testified about some of the symptoms associated with the victim's blunt force injuries as follows:

[S]ome of the things that might happen to you clinically if you have a head injury or - you can be irritable or cry a lot, you might not be feeding well, you can have vomiting with any kind of head injuries. Sometimes you act normal. Sometimes you don't have any symptoms. You can have seizures. You can get lethargic, real sleepy or even go into a coma.

She said that pain and headaches are associated with skull fractures. Dr. Campbell said that a routine physical exam would not have revealed the victim's injuries. The victim's head injuries would have required a CT or MRI scan for detection, and the rib fractures would have required an x-ray. She stated that, had the hemorrhages been detected, the victim could have been treated medically for the injuries.

Dr. Campbell testified that she took a nasal swab to look for the presence of a respiratory virus, and the results were negative. She also noted that the victim's thymus was small, indicating signs of stress. Dr. Campbell testified that based on the number of dead neurons in the victim's brain, the victim would have become less active "towards the end of life."

Dr. Marianne R. Neal, a pediatric radiologist, testified as an expert in the field of pediatric radiology. Dr. Neal reviewed post-mortem x-rays of the victim. She identified an image of an x-ray of the victim's left rib cage. Dr. Neal pointed out an area of "increased density or wideness" on the fifth through seventh ribs. She explained that this indicated a healing fracture of the posterior portion of the rib near the victim's spine. She said that the "callus," or healing, begins seven to ten days after a fracture occurs. She said that the victim's fractures could have been up to three weeks old but were at least seven to ten days old.

Dr. Neal identified an image of the victim's occipital bone in her skull. Dr. Neal pointed out a "squiggly line" that is a "normal suture in babies." She then pointed out four additional lines that are not normal and are consistent with skull fractures of the occipital bone. Dr. Neal said that she could not estimate the age of the skull fractures due to the slow

process of healing that occurs with skull fractures. Further, she was unable to view the overlying soft tissue, which can be used to date skull fractures. On another x-ray of the victim's skull, Dr. Neal stated that the normal suture line was "a little bit widened" indicating increased intracranial pressure or swelling on the brain. Dr. Neal described the victim's skull fractures as linear but complex. She said that complex skull fractures in infants are "suspicious" for non-accidental trauma. She said that a high force object striking the head or the head striking an object with high force is a mechanism consistent with the victim's type of injury. She said the victim's injuries would equate with a fall of ten feet or greater or a "high speed motor vehicle collision."

Dr. Neal testified that the frontal bone and the occipital bone are the thickest bones in the skull, and, therefore, rarely fractured. In her experience, fractures to the top and sides of the skull where the bone is thinner are more common. Dr. Neal opined that the victim's fractures would have caused underlying intracranial bleeding and swelling of the brain, which would have resulted in lethargy, irritability, vomiting, and seizures. She confirmed that pain was associated with skull fractures.

Dr. Neal testified that posterior rib fractures were highly specific for non-accidental trauma and generally consistent with squeezing. She said that the bones of infants bend more easily than an adult bone. She explained that the bones in infants will take "significant bending stress before breaking." Dr. Neal said that bruising is not common with rib fractures in infants, but often the fractures cause plural effusion, fluid on the lung, which is painful.

The State recalled Investigator Harrah to introduce a video recording of a second interview with Defendant Long. Investigator Harrah testified that, after the March 6, 2009 interviews, he learned more about the victim's injuries from the autopsy. On March 10, 2009, Defendant Long agreed to again speak with the police about the victim's death. This second interview was video recorded and played for the jury. The video footage showed Investigator Harrah confronting Defendant Long about the victim's injuries. Defendant Long confirmed that he was the only person with the victim and Lilliana on the day of the victim's death. He maintained that the victim was "fine that whole day." Defendant Long said that the victim was fine when Defendant Adkins left at approximately 3:00 p.m. Defendant Adkins called him from work at 7:00 p.m. or 8:00 p.m., and Defendant Long told her that the victim had been "puking." Defendant Long told Investigator Harrah, in reference to the victim, "I don't want it cremated."

During the interview, Defendant Long continued to deny any involvement in the victim's injuries. He admitted that he bathed the victim that day but denied that the victim ever fell off of the couch or that he dropped her. Investigator Harrah confronted Defendant Long with his prior statement that the victim did not sleep long periods of time on Tuesday

when the victim actually slept from 7:00 a.m. until 5:00 p.m.

The video recording portrayed Investigator Harrah leaving the interview room and, after a period of time, Investigator Teresa Higgins Campbell entering and asking Defendant Long about the victim's symptoms over the past week. Defendant Long told Investigator Campbell that the victim became sick the previous Friday, throwing up at around 4:00 p.m. or 5:00 p.m. after Defendant Adkins had gone to work. He said that they took the victim to the doctor on March 2, 2009, because Lilliana had a scheduled doctor's appointment, and Dr. Ledes looked at the victim during Lilliana's appointment. He said that he fed the victim Pedialyte on Saturday and Sunday, and she "barely" threw it up.

While speaking with Investigator Campbell, Defendant Long denied "bumping" the victim. He then said that he bumped the victim's head on the ledge of the bathtub as he was getting her out of the bathtub. He maintained that the bump was "not very hard" and that the victim "did not even cry." He demonstrated how he was seated on the ledge of the bathtub and reached down into the bathtub to lift the victim up onto his lap when she bumped her head. He denied dropping the victim. When asked why he had not disclosed this incident before, he said that he had tried to tell Investigator Harrah.

Upon further questioning during the videotaped interview, Defendant Long said that he was sitting on the toilet, not the edge of the bathtub, when the victim bumped her head on the ledge of the bathtub. Defendant Long said that the victim did not cry after this incident. Defendant Long drew a sketch of the bathroom and indicated on his diagram where he was seated and where the victim bumped her head on the bathtub. He maintained that this was "the only thing that [he] kn[e]w of" that could have caused injury and that there "wasn't nothing hurt." Defendant Long was not sure when this bathtub incident took place but then estimated that it was after the victim was "getting better," on Tuesday or Wednesday.

On the video recording, Defendant Long told Investigator Campbell that Defendant Adkins was at home on Saturday and Sunday and worked from 3:00 p.m. until 11:00 p.m. on Monday through the rest of the week. Defendant Long said that Defendant Adkins called the pediatrician's office on Saturday about the victim. A woman from the pediatrician's office returned the call and told Defendant Long to "give it a couple of days" to see if the victim could keep Pedialyte down. Defendant Long said that he went to the store and bought Pedialyte and that Defendant Adkins fed it to the victim on Saturday.

The video recording showed Investigator Campbell leaving the room and, thereafter, Investigator Harrah returned to the room. Investigator Harrah told Defendant Long that there was probable cause to detain him. Defendant Long then told Investigator Harrah that, on Friday, the victim rolled off the couch while he was in the kitchen. He said that he heard the

victim cry and ran into the room and picked her up off the rug. He said that the victim cried but that she acted "normal and fine" after the fall. Defendant Long said that he had not disclosed this incident because he did not want to sound like a "bad father." Defendant Long said that he did not tell Defendant Adkins about the victim's fall from the couch because he wanted to "save an argument." Defendant Long said that there were only two occasions that the victim hit her head: when he was retrieving her from the bathtub on Tuesday and when she rolled off the couch on Friday.

Billy Church, a Johnson City Police Department sergeant, testified that, on March 10, 2009, he spoke with Defendant Adkins in a separate room while Investigator Harrah interviewed Defendant Long. He recorded the conversation between he and Defendant Adkins with a handheld digital recorder. The audio recording of this interview was played for the jury. On the recording, Defendant Adkins told Sergeant Church that Defendant Long was her fiancé and that they had two children together: Lilliana and the victim. She said Defendant Long cared for their children while she was at work. Defendant Adkins stated that, at 1:00 a.m. Friday morning, she found the victim in her crib, already deceased.

Defendant Adkins told Sergeant Church that she took the victim to the pediatrician, Dr. Ledes, on the Monday before the victim's death because the victim had been sick. She explained that she had an appointment for Lilliana but that, during the appointment, she told Dr. Ledes that the victim was sick, and he agreed to "look at her." She said Dr. Ledes told her that it was the Norovirus, and "it would have to pass." Dr. Ledes instructed Defendant Adkins to use a medicine dropper, if necessary, to help the victim "to try to keep clear liquids down." She said the victim had been "throwing up" and "couldn't keep her bottles down." Defendant Adkins told the sergeant that, on Wednesday morning, at 5:00 a.m., the victim began "keeping all of her food down," began smiling more, was not sleeping as much, and her color improved.

During the recorded interview, Defendant Adkins told Sergeant Church that she woke up at around 10:00 a.m. on Thursday and got the victim from her crib and placed her on the couch. She recalled feeding the victim at 2:00 p.m. before leaving for work at 3:00 p.m. She called Defendant Long during her break between 6:00 and 7:00 p.m., and he told her that the victim had not eaten and "that all she wanted to do was sleep." Defendant Adkins said that she told Defendant Long that Dr. Ledes said that it was okay for the victim to "rest." When Defendant Adkins returned home from work that night at 10:00 p.m., she took Lilliana out of her bed and checked on the sleeping victim, who was "fine." Defendant Adkins put Lilliana back into her bed at 11:00 p.m., and she heard the victim grunting. She went over to the crib, rubbed the victim's head, and the victim cooed. Defendant Adkins went out to the living room and watched television until 1:00 a.m. Before going to bed for the night, Defendant Adkins decided to try and feed the victim since she had not eaten since before

Defendant Adkins left for work at 2:00 p.m. Defendant Adkins said that when she picked the victim up out of her crib, the victim was cold, so she called 911.

During the interview, Defendant Adkins said that Defendant Long tried to feed the victim at 6:00 p.m. on Thursday but that the victim "just wanted to sleep." Defendant Adkins described Defendant Long as a "good father" and said that he was "really good" with their children. She denied that Defendant Long used drugs. She said Defendant Long used to drink alcohol but stopped drinking alcohol when they had their first child, Lilliana. She said that he was disappointed about losing his job but was not depressed. She said that the Defendant never got frustrated or yelled at the children. She acknowledged that she and the Defendant had argued and that police had come out to the apartment one time due to an argument between the couple.

The video recording showed Sergeant Church excusing himself and leaving the room for several minutes. When he returned, he told Defendant Adkins about the results of the autopsy. She maintained that Defendant Long "would never hurt [the victim]." She described Lilliana as "a Daddy's girl." She said that there had never been any incident of abuse with Lilliana, and that Lilliana was not scared or fearful of Defendant Long. Defendant Adkins maintained that the victim was "fine" and that she had been "getting better."

Sergeant Church testified that, after he finished interviewing Defendant Adkins, he allowed Defendant Adkins to speak with Defendant Long. The video recorder that had been recording during Defendant Long's interview continued to record during the discussion between Defendant Long and Defendant Adkins. The video recording of this conversation was played for the jury. Upon entering the room, Defendant Adkins asked Defendant Long, "Why are you changing your story? Why didn't you tell me?" Defendant Adkins then confronted Defendant Long about his telling multiple stories regarding the possible source of the victim's injuries, and she told him he was going to jail because he kept "changing his story." Defendant Adkins said, "You didn't really want two kids, did you?" and Defendant Long responded, "Yes, I did."

During the exchange, Defendant Adkins acknowledged that Defendant Long told her she should take the victim to the hospital but responded that she did not seek medical attention because she was unaware the victim had fallen from the couch. Defendant Adkins asked Defendant Long how the victim fell off the couch when she could not yet roll over, and Defendant Long responded that he did not know. Defendant Adkins told Defendant Long that the victim's brain was bleeding and "that's why she couldn't function or smile that much." She asked Defendant Long if he remembered the day when the victim was "boxing" and "jerking," and he said he did. She told Defendant Long that the victim's body was jerking in that manner because there was "so much" blood on the victim's brain.

-12-

On cross-examination, Sergeant Church testified that Defendant Adkins was aware that her interview with Sergeant Church was recorded. As to the conversation between Defendant Adkins and Defendant Long, Sergeant Church did not inform Defendant Adkins that the conversation would be recorded, but he believed she knew of the recording because the camera was "visible." He explained that the camera position had, at one point, been in a position that was more obscure, but he thought it had been moved to a more visible location at the time of these recordings. Sergeant Church testified that both defendants were released after the March 10, 2009 interviews.

Sam Phillips, a Washington County Sheriff's Office deputy, testified that he interviewed Defendant Long on March 13, 2009, regarding the victim's death. He identified a DVD recording of the interview, and the State played the recording for the jury. During the interview, Defendant Long told Deputy Phillips that "his little girl" fell off of the couch on Friday, six days before her death. Defendant Long said he was in the kitchen at the time but immediately ran to pick up the victim who was crying. He said the victim was "completely fine." He recalled that Lilliana had also fallen off the couch as an infant and that she was "okay." He said that the victim began vomiting the following day, Saturday. He said that "we" thought it was just the Norovirus that was causing the victim to vomit. Defendant Long told Deputy Phillips that Dr. Ledes looked at the victim when they took Lilliana for her annual appointment on Monday. He said the victim was drinking Pedialyte and improving as the week progressed.

During the recorded interview, Defendant Long said that his fiancée, Defendant Adkins, called Johnson City Pediatrics on Saturday about the victim and was told Dr. Bowman would return her call. Defendant Adkins got into the shower, and Defendant Long answered the return telephone call from Dr. Bowman. He explained the victim's symptoms to Dr. Bowman, and Dr. Bowman advised him that a "stomach virus was going around" and to give the victim Pedialyte. Dr. Bowman said to give the victim one-half to one ounce. Defendant Long went to the store and bought Pedialyte for the victim. He tried to feed the victim Pedialyte, but she threw it up.

Defendant Long recalled that the vomiting began on Saturday morning at 5:00 a.m. and continued through Sunday and Monday. He said that on Tuesday and Wednesday the victim began eating and "keeping it down." Based on her improvement, Defendant Long said he "didn't understand" because the victim "was fine." He said that the victim did not vomit on Thursday at all. He denied that the victim displayed any other symptoms. Defendant Long said that he did not tell Dr. Ledes about the victim's fall off the couch. He said that he did not tell anyone because he was afraid. He said that he did not tell Defendant Adkins about the couch incident in order to "save an argument."

Defendant Long recounted the hours leading up to the victim's death. He said that he put the victim in her crib between 7:00 and 8:00 p.m. and then put Lilliana in her bed at 9:30 p.m. He said that he checked on the victim when he put Lilliana to bed and that the victim was "fine." He recalled that Defendant Adkins arrived home from work at around 10:40 p.m. and took Lilliana out of her bed. When she did this, she checked on the victim. Defendant Adkins went back into the children's room at 1:00 a.m. to feed the victim and found the victim "cold." He said Defendant Adkins began screaming, "She's dead." He called 911, and the operator told Defendant Long to began administering CPR on the victim. Defendant Long agreed that when he put the victim in her crib at around 7:00 p.m. she was "totally normal" and "alert."

Defendant Long told Deputy Phillips that he bathed the victim Friday night after she fell off the couch and that he felt the back of the victim's head and she was "fine." Defendant Long maintained that he did not harm the victim. At some point, Defendant Long told Deputy Phillips that he stood up in the bathroom after bathing the victim, and she slipped from his hands and hit the tub and then the floor. He said he was not sure how her head hit because he was "trying to hurry up and pick her back up." He said that the victim did not lose consciousness when she fell but cried for five or ten minutes. He explained that this accident was due to his trying to do too many things at once. Defendant Long said that he told Defendant Adkins that the victim hit her head on the bathtub but did not tell anyone else. He maintained that the victim did fall off the couch earlier that day, before the bath, but she was "okay."

Deputy Phillips left the room briefly and returned with the autopsy report. He showed Defendant Long the victim's injuries. Defendant Long said that the victim sustained the injuries when she hit her head on the bathtub. Defendant Long maintained that he did not hurt the victim. He said that he was never frustrated with or mad at the victim.

Teresa Campbell, a Johnson City Police Department investigator, testified that, in addition to assisting Investigator Harrah in Defendant Long's March 10, 2009 interview, she also interviewed Defendant Adkins on March 13, 2009. Investigator Long explained the circumstances that brought Defendant Adkins into the police office that day. She said that the police were attempting to locate Defendant Long and, instead, made contact with Defendant Adkins. Police brought Defendant Adkins back to the police department where Investigator Campbell interviewed her. Investigator Campbell explained that this interview was not recorded due to "some issues" with the recording devices at that time. Instead, Investigator Campbell handwrote notes during the interview and then reviewed the document with Defendant Adkins, giving her the opportunity to make changes if necessary. After reviewing the statement, Defendant Adkins and Investigator Campbell both signed the statement. Investigator Campbell read the statement for the jury as follows:

[Defendant Long] and I been dating for four years. Around April 6, 2008, [Defendant Long] and I broke up and he moved back to Chicago with his uncle. A short time after April 23rd, I found out that I was pregnant. I called and told [Defendant Long] that I was pregnant with our second child. [Defendant Long] decided to come back to Johnson City to be with me and he got back on May 20th, 2009 [sic]. When he got back, he stayed with a friend for a while and we eventually got an apartment at Clark Manor. [The victim] was born December 11th, 2008. [Defendant Long] lost his job working at Traco Windows around the first week of February 2009. [Defendant Long] and I talked about him staying at home with the kids while I worked and he agreed that it wouldn't be a problem. On Friday, February 27, 2009, I fed [the victim] around 12:00 p.m. She was acting normal, she was laughing and being herself. She did not act sick. I left for work around 3:00 p.m. I called [Defendant Long] between 6:45 and 7:30 p.m. to check on the kids. He said [the victim] was lying on the couch and that he had fed her around 7:00 p.m. He said that after that, she fell asleep. I called him again around 9:00 p.m. [Defendant Long] said that [the victim] was in her crib. I got home around 11:45 p.m. On Saturday, February 28th, 2009, [the victim] woke up around 5:00 a.m. I fed her 4 ounces of formula with rice cereal. About two minutes after I fed her, she puked. She puked all day Saturday every time she was fed. She would doze off for about thirty minutes to an hour and wake up and cry all day long. I walked around with her all day while she cried. She had a different - a different sounding cry that day. [The victim] puked and slept all day long. Finally around midnight she fell asleep. On Sunday, March 1st, 2009, [the victim] woke up around 4:30 a.m., which was unusual because she was sleeping through the night now. I fed [the victim] again and she slept - and she kept it down for about fifteen minutes and puked it up. She and I laid on the couch and slept till around 10:00 a.m. I tried to feed her again around 11:30 a.m. but she wouldn't take the bottle. She was making whimpering sounds. I put her in the swing and she fussed for about fifteen minutes. She slept all day until about 3:00 p.m. She'd wake up for a few minutes here and there and cry but would fall back asleep. I got [the victim] up around 3:00 p.m. and got her to drink one and a half ounces. I tried to burp her and she puked. I called Johnson City Pediatrics and spoke to the answering service. They told me that a doctor would call me back in thirty minutes. About ten minutes later, a doctor called and talked to [Defendant Long]. [Defendant Long] told him about [the victim] being sick and the doctor said to try Pedialyte. The doctor said to try Pedialyte the rest of the day, and if she couldn't keep it down, then to take her to the hospital. [Defendant Long] went to the store and got [the victim] some Pedialyte. I gave her two ounces of it and she kept it down. About thirty minutes later, I laid her in the crib. About thirty

-15-

minutes after that, Terri and Glen from next door came over. I told Terri that [the victim] was sick and she wanted to see [the victim]. Terri and I went to [the victim]'s room and talked. Terri and Glen left shortly thereafter. About an hour after Terri and Glen left, [the victim] woke up screaming and crying. A little while later, we, me, [Defendant Long], [the victim] and Lilliana, went to my friend Wayne and Gayle's house in Erwin. [The victim] slept all the way there, while we were there and all the way back home. [The victim] woke up when we got back home while I was - while I was taking her out of the car seat around 8:30 p.m. [The victim] got a little fussy and I gave her one ounce of Pedialyte and she kept it down. So at 9:00 p.m., I tried giving her two ounces of formula and she puked. I put [the victim] to bed around 9:30 p.m. and she slept all night. Also, I noticed that [the victim] was not her usual color on Sunday, she looked pale. I just thought it was from where she was sick and was weak. Monday, March 2nd, 2009, [the victim] woke up around 7:00 a.m., I gave her three ounces - a three-ounce bottle of formula, she drank all of it, she puked it back up. I laid [the victim] on the couch where she slept until 7:45 a.m. Around 8:50 a.m., I put [the victim] in the car seat so we could take Lilliana to the doctor. We went to the doctor and saw Dr. Ledes. I told the doctor that [the victim] had been sick. The doctor looked at [the victim] and said the symptoms sounded like the norovirus. The doctor said that [the victim] may have the virus. [The victim] slept nearly the rest of the day on the couch. [The victim] slept better on the couch with her head propped up than in her crib. I went to work around 3:00 or 3:15 p.m. I called [Defendant Long] around 4:45 to 5:00 p.m. He said that [the victim] was still asleep and she sounded congested. I called [Defendant Long] again around 7:30 p.m. and [Defendant Long] said that Glen came over and tried to feed [the victim] a different type of formula. [Defendant Long] and I argued about him trying the new formula and [Defendant Long] told me she didn't hold it down either. I called [Defendant Long] again around 9:15 p.m., and he said that he tried to give [the victim] some Pedialyte, but she would not take it. I got home around 11:00 to 11:15 p.m. [Defendant Long] said he had put [the victim] to bed around 10:00 p.m. I checked on [the victim], she seemed fine. Tuesday, March 3rd, 2009, around 3:30 a.m., [the victim] woke up. [Defendant Long] got up and fed her two ounces of formula and he said she spit up a little. [Defendant Long] put [the victim] back to bed. [The victim] woke up again around 10:30 a.m., I got her and put her on the couch. At around 11:15 a.m., I fed [the victim] two ounces of Pedialyte. She kept it down, I laid her back on the couch. She stayed on the couch until noon when she woke up. I then put her in her crib. I checked on her around 1:45 p.m. and then again at 2:30 p.m. before I left for work. I left for work about 2:30 p.m. At about 10 - at about 7:10 p.m., I called [Defendant

-16-

Long].  He said that [the victim] ate around 6:00 p.m. and puked a little.  I got home around 10:30 p.m.  I looked at [the victim] around 12:30 a.m. and she was fine.  On Wednesday March 3ʳᵈ, 2009, I fed [the victim] around 5:00 a.m., she kept it down.  I put her back to sleep and she woke up at about 9:30 a.m.  I fed her three ounces of formula and she kept it down as well. [The victim] slept the whole day on the couch.  She didn't eat while I was there the whole day after 9:30 a.m.  I went to work at around 3:00 p.m.  I called [Defendant Long] around 7:00 p.m., and he said [the victim] was up but had not ate.  I noticed that [the victim] had more color on Wednesday also.  She also stayed awake longer too.  I called [Defendant Long] around 9:30 p.m., and he said that he fed [the victim] around 8:15 p.m. and she kept it down.  I got home from work around 10:45 p.m., [Defendant Long] told me that he put [the victim] to bed around 10:00 p.m.  Thursday March 4ᵗʰ, 2009, [the victim] woke up around 8:00 a.m. fussing.  I gave her a pacifier and she slept until around 12:30 p.m.  At around 12:30 p.m., I tried to feed [the victim] a bottle and she wouldn't take it, she'd just lay awake on the couch.  At around 2:00 p.m., I gave her three ounces of formula and she kept it down.  I left for work at about 3:00 p.m.  I called [Defendant Long] at around 7:30 p.m., he said that [the victim] had been awake and had laid in her crib - and he had laid her in her crib around 7:00 p.m.  I got home from work around 9:45 or 10:00 p.m.  I went to the kitchen, smoked and talked to [Defendant Long].  Lilliana started calling for me to come get her.  At first, [Defendant Long] didn't want me to get her, but I eventually did.  I played with Lilliana for a little bit and put her back in the bed around 11:00 p.m.  I walked over to [the victim] and looked at her.  She made a noise and sounded like she was congested.  I rubbed her face and her lip moved.  I went back into the living room, I played Guitar Hero.  At around 1:00 a.m., I told [Defendant Long] I was going to try to feed [the victim] since she hadn't eaten since 2:00 p.m.  I picked her up, she was cold and her body was limp.  I screamed that she was dead and [Defendant Long] just looked at me and said, "What do you want me to do?"  I told [Defendant Long] to call 911 and he did.  I took [the victim] to the den and put her on the couch.  The 911 operator was telling [Defendant Long] to give [the victim] CPR.  I went outside and started screaming and crying and waiting for the ambulance.

Investigator Campbell testified that she also interviewed the defendants' neighbor, Terri Adams.

Angie Galloway testified that, at the time of these events, she worked as a child abuse investigator for the Department of Children's Services ("DCS").  Galloway explained that she was assigned to investigate this case.  The initial information was "a baby death," which

Galloway described as "very vague." In the course of her investigation she met with both defendants in order to assess the safety in the home for the remaining child, Lilliana. Galloway recalled that, initially, she observed the police interviews of both defendants. After the police interview, Galloway met with Defendant Adkins on multiple occasions to discuss the circumstances surrounding the victim's death. Defendant Adkins told Galloway that she worked at ACT and returned home one Friday night at around 11:00 p.m. She was worried because the baby had been sick and attempted to feed the victim a few ounces, and the victim threw that up. Defendant Adkins said the victim continued to be sick throughout the weekend so she called the doctor's office on Sunday and was instructed to give the victim Pedialyte. If the victim did not improve, Defendant Adkins was to bring her in to the doctor's office. At some point during the following week, there was a doctor's office visit during which Defendant Adkins asked the doctor about the victim. The doctor told Defendant Adkins that there was a stomach virus "going around" and to continue giving the victim Pedialyte.

Galloway testified that she had a conversation with Defendant Long at the time she served him paperwork regarding custody of Lilliana. Defendant Long expressed concern to Galloway about the family members Defendant Adkins had identified as options for placement for Lilliana. At some point in the conversation, Galloway became aware that Defendant Long did not initially think the victim was his child. Galloway asked the Defendant about this, and "he said he had been out of town working . . . when [Defendant Adkins] originally found out she was pregnant, and there was some doubt as to whether [the victim] was his."

Tracy Fair, a nurse employed at Johnson City Pediatrics, testified that she assisted Dr. Ledes on March 2, 2009. She recalled seeing Defendant Adkins and Defendant Long in the office that day for Lilliana's routine visit. Fair said that the victim was at the appointment with the family that day as well. Fair said that neither of the defendants ever mentioned to her any issue with the victim or mentioned anything to Dr. Ledes about the victim while she was present. Fair said that, had the defendants mentioned that the victim had been vomiting, she would have "checked in" the victim to be seen by a physician. She said that checking in a patient is a fairly easy process. Fair said that if either she or Dr. Ledes had examined the victim it would have been documented as they are legally obligated to do with every patient.

On cross-examination, Fair said that she did not recall anything unusual about the victim or her appearance on that day.

Dr. Chris Ledes, a Johnson City Pediatric Office physician, testified about the protocol followed in the office when seeing or examining patients as follows:

We try our best to document any discussion, any encounter with any child in

our charts. Now before electronic medical records, we did that by way of paper. Now it's kept on a server so there are no sticky notes falling out of charts or pages that rip out, and that's - that's of several different varieties. There's a scheduled appointment encounter where that will be - show up in the chart as a history and a physical exam and a disposition or a decision as far as what the diagnosis is, that sort of thing, and that's organized as encounters. There are also patient messages such as when mom calls in, asks a question, if I have a discussion with her, the nurse has a discussion, that goes in the patient message section and other things, prescription request, things like that, it should all be there.

Dr. Ledes explained that this electronic system documents the child's history and that he carries a device into the room with him for reference and to add in new information as he meets with a patient.

Dr. Ledes identified the victim's medical records. He said that the first page indicated four different visits: a newborn check-up, a weight re-check, a one-month check-up, and a two-month check-up. He said that this is a routine appointment schedule for a new baby. He read aloud for the jury the last entry, which was the victim's two-month check-up on February 23, 2009.

Patient is a ten-week-old female who's here for a well visit. The child is here for a two-month visit. The historian is the mother. The child's nutritional intake is formula from a bottle. The brand of formula is Good Start. Feeding takes place every four hours. The number of feedings are six per day. The child takes in four ounces or four to five ounces per feeding. The child is going to the bathroom a normal number of times a day, urinating a normal number of times a day. Participates in the WIC program. The patient has not been experiencing problems or concerns.

. . . .

Child responds to sounds. The child looks at parents' faces. The caretaker does not have concerns about development or behavioral issues. The patient's sleeping habits include sleeping through the night, sleep seven to eight hours a night. And the patient is not in daycare.

Dr. Ledes testified that the victim was given a complete exam that day with no noted abnormalities. Dr. Ledes said that a four ounce feeding every four hours is "normal range" for an infant of the victim's size and age. Dr. Ledes identified a "call-in note," which

documents conversations between physicians and parents during on-call hours. The note indicated that Defendant Adkins called the office on Sunday, March 1, 2009, with the complaint that the victim was not keeping formula down. The doctor handling the call wrote, "Vomiting-up formula, no fever, no diarrhea. Recommended Pedialyte, small amounts. Call back if not keeping down." Dr. Ledes explained that Pedialyte is not a substitution for milk or formula but is used for re-hydration purposes.

Dr. Ledes identified Lilliana's medical records. He testified that he performed Lilliana's routine two-year-old exam on March 2, 2009. He said that the victim was present with the family during the appointment but that he did not examine the victim. He said that he "vaguely recall[ed]" a "hypothetical question about if a baby were vomiting" at the end of the checkup. Dr. Ledes said that he responded that a baby should be able to keep down little bits of fluid and, if not, should be seen by a physician. He did not recall any further discussion and reiterated, "it was sort of a hypothetical question in passing." Dr. Ledes said that if a parent mentioned concerns about the condition of a child, he would have made an appointment to see the child. He said children often get sick "suddenly" and the practice accommodates such situations routinely. Dr. Ledes said that if the defendants had told him that the victim had been vomiting since Friday and could not keep formula down, he would have asked them to have the victim seen by a physician. Dr. Ledes said that if he had been told the victim had fallen from the couch and hit her head, he would have wanted to examine the victim.

Dr. Ledes testified that Lilliana's chart indicated that she had been brought to the physician's office for the following reasons: first newborn checkup, jaundice, two-week checkup, weight checkup, one-month checkup, two-month checkup, sore throat and cold, trauma to the face, four-month checkup, a rash, six-month checkup, an upper respiratory infection, nine-month check up, flu shot, teething and fluid behind the ear drum, twelve-month checkup, vomiting and diarrhea, cold with vomiting, a fifteen-month checkup, an eighteen-month checkup, upper respiratory infection, and a two-year-old checkup. Dr. Ledes read aloud for the jury the entry from February 21, 2008: "The Patient is a twelve-month-old female who presents with a complaint of vomiting. The vomiting has been occurring for one day. The course has been worsening. The symptoms have been associated with diarrhea and fever. The historical information was given by the mother and father."

On cross-examination, Dr. Ledes agreed that, based on the medical records, it appeared that both of the defendants' children had appropriate medical histories.

Upon agreement by the parties, the following stipulations were admitted into evidence: Johnson City Pediatric medical records for the victim and Lilliana; Johnson City Medical Center records for Lilliana; North Side Hospital medical records for Lilliana.

Investigator Harrah testified about the events leading up to the Defendant Long's arrest on March 13, 2009. He said that Defendant Adkins had not been charged at that time. Investigator Harrah said that on March 6, both defendants provided him with their cellular phone numbers. On March 6, both defendants came to the police department and spoke with Investigator Harrah. Investigator Harrah contacted the defendants on March 10, and both defendants came to the police department. After the defendants were released on March 10, Investigator Harrah tried to contact the defendants but neither would answer their phone. On March 13, 2009, several undercover officers located Defendant Adkins's van. Police informed Defendant Adkins that they were going to arrest Defendant Long. Defendant Adkins initially told police that she did not know Defendant Long's whereabouts but later told police he was at a house on Stoney Creek.

Investigator Harrah testified that on March 19, 2009, he spoke with Fair and that on March 23, 2009, he spoke with Dr. Ledes about the medical attention sought for the victim. After speaking with Dr. Ledes and Fair, Investigator Harrah interviewed Defendant Adkins on March 24, 2009. A recording of this interview was played for the jury. Investigator Harrah confronted Defendant Adkins with the inconsistencies between her account of the medical attention sought for the victim and the pediatric office's records for the victim. Defendant Adkins confirmed that Dr. Ledes told her that the victim had a stomach virus. She said that Dr. Ledes instructed that she continue giving the victim Pedialyte and, if she had a fever, to give her Motrin. Defendant Adkins gave a detailed account of Dr. Ledes instructions regarding the victim's ability to keep clear liquids down. She agreed that she had previously stated that Dr. Ledes looked in the victim's ears. She clarified saying that the doctor did not use an instrument to look in the victim's ear but turned her head and just visually looked into each of the victim's ears and then pressed the victim's stomach. Defendant Adkins physically demonstrated Dr. Ledes examination of the victim. As the interview progressed, Defendant Adkins said that Dr. Ledes "just rolled over there" and looked at the victim. Investigator Harrah asked for clarification about whether the doctor examined the victim or looked at her and Defendant Adkins said that Dr. Ledes just looked at her because the victim was sleeping.

Defendant Adkins said that the doctor told her that the victim had "a bug and it had to run its course." She agreed that she told police that she called Dr. Ledes on the Tuesday before the victim died because the victim had slept from 7:00 a.m. until 5:00 p.m. and that Dr. Ledes had said that the victim needed to rest. When confronted with the fact that the pediatrician's office had no record of anyone calling regarding the victim on Tuesday, Defendant Adkins said that Defendant Long told her that he called the pediatrician's office.

Defendant Adkins stated that she knew something was wrong with the victim because the victim's "eyes would jerk," and she "just stared." Defendant Adkins admitted that she did not do all she could have done to seek medical attention for the victim. She stated, "You

don't think I know that if I . . . would've f\*\*king done more that she might still be alive?"

Defendant Adkins maintained that she did not seek medical attention for the victim because the victim showed improvement on Wednesday. Despite Dr. Ledes's statements to the contrary, Defendant Adkins maintained that she spoke with Dr. Ledes about the victim's illness at Lilliana's annual examination. She conceded that she did not tell Dr. Ledes that the victim was not having bowel movements. She also conceded that Dr. Ledes did not give the victim a full examination but maintained that he looked in the victim's ears and pressed her stomach.

Defendant Adkins denied that she asked Adams, her neighbor, to come over to the apartment and look at the victim. She said that Adams came over to the apartment when her boyfriend, Rokicka, brought Defendant Long clothing and asked to see the victim.

Defendant Adkins admitted that she lied to police about calling the pediatrician's office on Wednesday. She said she did not know why she told police that she called the pediatrician's office on Wednesday.

The State rested its case, and Defendant Long presented the following witnesses on his behalf: Gail Ashby testified that she had known the defendants for six or seven years and saw them on a weekly basis. Ashby said that through these interactions she had the opportunity to observe Defendant Long with the children and described his relationship with the children as "good." She said when Defendant Long spoke with Lilliana, he was "soft" and respectful.

Ashby testified that she last saw the family about a week before the victim died. During the visit, she had occasion to hold the victim and described her as looking "good." She said that the victim cried "a little bit" and that Defendant Adkins told her the victim had a "belly ache."

On cross-examination, Ashby said that the defendants were in her home during their last visit for approximately two hours, and she held the victim for "maybe" twenty minutes. Ashby said that the victim did not eat that day while at her house, and she did not recall seeing either parent try to feed the victim. Ashby said that several days after the visit, Defendant Adkins told her the victim was vomiting. Ashby and Defendant Adkins spoke on three occasions over the telephone about the victim's illness. During one of these conversations, Defendant Adkins told Ashby she had taken Lilliana to the doctor and mentioned to the doctor that the victim was sick.

Dr. Jonathan Arden testified as an expert witness in the field of pediatric forensic

pathology. In preparation for his testimony, Dr. Arden reviewed the victim's autopsy report, photographs, radiographs, slides, medical records, and police investigative reports. Dr. Arden identified the photograph of the inside of the victim's scalp. He pointed out the localized areas of bleeding, or bruising, which are caused by "impact." He said it was not impossible but was unlikely that the bruising on the victim's scalp were caused by knuckles or a fist. He explained that the pattern of bruising was not consistent with the pattern of four knuckles from a hand.

Dr. Arden testified that he reviewed Dr. Campbell's microscopic summary and correlating slides. He stated that he agreed with her description of the injuries. He explained the healing process present in the various areas of the victim's brain indicated injuries sustained at different times. He said that the bruising did not occur on the night the victim died but were already present at the time of death and beginning to heal.

Dr. Arden testified about the microscopic slides of the subdural hematoma. He said the reports and photographs indicate that there was subdural bleeding "from fresh to healing to greater healing ages." He explained that "fresh bleeding" is an injury that occurred within a day. "[H]ealing" indicates injuries approximately five to eight days old, and "greater healing" indicates injuries sustained two weeks before or longer. Dr. Arden said that force is required to sustain a hemorrhage or hematoma. He said the circumstances usually involve "some kind of either acceleration or rotation of the head that tears the little blood vessels that allow for the subdural bleeding."

Dr. Arden explained that, whereas a subdural hematoma requires more than "light trivial force," a "re-bleed" or subsequent additional injury can occur with a "lesser impact" or degree of force than the original injury. Dr. Arden said that he disagreed that force equivalent to either a high fall or motor vehicle accident was necessary to cause the victim's injuries. He stated, "It is now very well-documented in the medical experience and medical literature, that you do not require huge extreme amounts of force to cause significant, and even sometimes fatal head injuries in children." He agreed that "short falls" do not commonly cause serious injury but that the circumstances of the fall must be considered.

Dr. Arden testified that he was provided a hypothetical scenario to consider in the case. The scenario involved a child being held by an adult horizontal to the ground and then dropped and landing on the edge of a bathtub with the passage of time from the event to death of approximately one week. Dr. Arden said that "some" of the victim's injuries were consistent with this scenario. Dr. Arden explained that rib fractures can be caused by compression; however, rib fractures can also result from contact injuries. He explained that a hard landing on a flat surface can cause some compression resulting in fractures. He stated that the aging of some of the injuries were consistent with an approximately one week old

injury.

On cross-examination, Dr. Arden stated that the scenario presented "could explain basically some" of the injuries, but not all of the victim's injuries. Dr. Arden agreed that the manner of death in this case was a homicide, "death at the hands of another person."

Following this evidence, the jury convicted Defendant Long of first degree felony murder committed during the perpetration of aggravated child abuse and first degree felony murder committed during the perpetration of aggravated child neglect. The jury convicted Defendant Adkins of first degree felony murder committed during the perpetration of aggravated child neglect. The trial court merged Defendant Long's convictions and sentenced both defendants to serve life with the possibility of parole in the Tennessee Department of Correction. It is from these judgments that the defendants appeal.

## II. Analysis

On appeal, Defendant Long asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court allowed the introduction of inadmissible hearsay evidence through the videotaped conversation between the defendants; and (3) the trial court erred by failing to exclude an autopsy photograph of the victim. Defendant Adkins asserts that: (1) there is insufficient evidence to support her conviction; and (2) the trial court improperly overruled her objection to the State's use of a visual aid during closing arguments.

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for

-24-

sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2010). In this case, Defendant Long was convicted of first degree felony murder in the perpetration of aggravated child abuse, and both defendants were convicted of first degree murder in the perpetration of aggravated child neglect. The mental state required for these convictions was that the defendants possess the intent to commit the underlying

offense, which in this case was aggravated child abuse and/or aggravated child neglect.

Aggravated child abuse occurs when the accused knowingly, other than by accidental means, treats a child under the age of eighteen in such a manner as to inflict injury and the act of abuse results in serious bodily injury to the child. T.C.A. § 39-15-401(a) (2010); § 39-15-402(a)(1) (2010). Aggravated child neglect occurs when the accused knowingly treats a child under the age of eighteen so as to adversely affect the child's health and welfare and the act of neglect results in serious bodily injury to the child. An accused acts "knowingly" with respect to his or her conduct "when [he or she] is aware of the nature of the conduct." T.C.A. § 39-11-302(b) (2010).

### 1. The State's Evidence Supporting Defendant Long's Convictions

Defendant Long argues that the State failed to prove that he "knowingly" committed either aggravated child abuse or aggravated child neglect. Defendant Long notes that "[t]here was no direct proof that [he] knowingly or intentionally caused the injuries." As we previously stated, a criminal offense may be established solely by circumstantial evidence. It is for the jury to determine "the weight to be given to circumstantial evidence, . . .'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *Rice*, 184 S.W.3d at 662. Therefore, we review circumstantial evidence under the same standard as direct evidence. *Dorantes*, 331 S.W.3d at 379.

### a. First Degree Felony Murder Committed During the Perpetration of Aggravated Child Abuse

The evidence, presented in the light most favorable to the State, showed that Defendant Long was the sole caregiver to both children while Defendant Adkins was at work. While Defendant Adkins was at work, loud music and the victim's crying could be heard from outside the defendants' apartment. Medical testimony showed that the victim sustained multiple injuries in various stages of healing, indicating that the injuries were not the result of one incident. The victim suffered from multiple fractures of her occipital bone, fractured ribs, and subdural hemorrhages; injuries inconsistent with non-accidental trauma. The autopsy indicated the cause of death was non-accidental blunt force trauma to the victim's head. Defendant Long was interviewed several times about the victim's death. Initially, he denied any knowledge of the cause of the victim's injuries. Later, he stated that the victim fell approximately eighteen inches from the couch onto a rug on the floor. Later, he added that the vicitm also fell from his arms after a bath, hitting her head on the bathtub. Dr. Campbell testified that a short fall was unlikely the cause of such injuries and that a single injurious event was not consistent with the victim's injuries.

Defendant Long's neighbors urged him to seek medical help for the victim and his response was that he could not seek medical help for the victim because he did not have the victim's birth certificate or the TennCare card. On the Monday before the victim's death, Defendant Long sat with the victim in the pediatrician's office with a physician in the room examining his other child, Lilliana, and he did not mention the victim's symptoms or any accidents that may have caused injury to the victim.

After willingly speaking with police on March 6, 2009, and March 10, 2009, Defendant Long did not answer or return Investigator Harrah's telephone calls and moved to a location other than his apartment.

This evidence is sufficient for a jury to find the Defendant guilty beyond a reasonable doubt of first degree felony murder during the perpetration of aggravated child abuse. Defendant Long contends that the proof does not exclude the reasonable inference that the victim's injuries were caused by an accidental fall. The jury heard Defendant Long's statements to police recounting possible scenarios for how the victim could have been injured. The jury, however, also heard the medical testimony indicating that the victim sustained a series of traumas over a period of time. Further, they heard two physicians, one of which testified for Defendant Long, state that the victim's manner of death was homicide, a non-accidental death at the hands of another person. Defendant Long's accounts of how the victim sustained the injuries, falling from the couch and hitting her head on the bathtub, according to medical testimony, do not account for all of her injuries. It is within the province of the jury to assess witness credibility and determine the weight and value to be given to the evidence. *Bland*, 958 S.W.2d at 659. The jury, by its verdict, credited the medical testimony in this case.

In addition to the medical testimony, the jury considered evidence that the victim was in the custody and control of Defendant Long, Defendant Long's evasive behavior during the course of the investigation, and out-of-court statements by Defendant Long that were inconsistent with the medical evidence. Under these circumstances, we conclude that the jury had the prerogative to infer that Defendant Long acted knowingly, with an awareness of the nature of his conduct, rather than accidentally.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find beyond a reasonable doubt that Defendant Long knowingly inflicted injuries upon the two-month old victim resulting in serious bodily injury. Defendant Long is not entitled to relief as to this issue.

**b. Felony Murder Committed During the Perpetration of Aggravated Child Neglect**

The evidence, considered in the light most favorable to the State, proves that Defendant Long cared for the victim while Defendant Adkins was at work. On the Friday before her death, the victim became unable to keep down her formula. Her inability to consume formula continued Saturday and Sunday. On Sunday, Defendant Adkins called the pediatrician's office, and Defendant Long answered the return call. He informed the on-call doctor that the victim had been vomiting. He did not mention the victim's fall from the couch or her hitting her head on the bath tub. Based on the information provided, the on-call physician instructed Defendant Long to feed the victim Pedialyte for an upset stomach. Adams, the defendants' neighbor, saw the victim on Sunday and voiced concern over the victim's color and response. She described the victim as "lifeless." Adams offered to care for Lilliana so that Defendant Long could take the victim to the hospital, an offer he refused. On Monday, the victim, still unable to consume her formula, was present during Lilliana's annual medical exam, where Defendant Long remained silent about both the victim's symptoms and any falls sustained by the victim. On Tuesday, the victim slept from 7:00 a.m. until 5:00 p.m. On Wednesday, the victim made her first bowel movement since the previous Friday. During the video recording of the defendants conversation, the defendants discussed the victim's "jerking" movements observed by both of the defendants at some point during the week.

This evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that Defendant Long failed to seek medical treatment for his severely injured child resulting in her death, which constituted "neglect" pursuant to the statute. Defendant Long asserts that he did not have "the medical knowledge to surmise" the victim's injuries. Defendant Long certainly could not have known the victim's exact injuries; however, he was aware that the victim could no longer consume her formula beginning on the Friday before her death, that she failed to make a bowel movement for at least five days, that she was sleeping excessively, and that she was displaying jerking movements. Moreover, on the video recording of the defendants' discussion, Defendant Long reminds Defendant Adkins that he said they should take the victim to the hospital. This evinces his awareness of medical concerns in relation to the victim and his subsequent failure to follow through with his belief that the victim needed medical attention. Defendant Long spoke with an on-call physician over the telephone on the Sunday before the victim's death and sat in a pediatric medical examination room on Monday with a physician, yet he chose not to address the victim's medical concerns either time.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that Defendant Long's failure to seek medical treatment for the victim adversely affected her, resulting in serious bodily injury to the victim. The Defendant is not entitled to relief as to this issue.

## 2. The State's Evidence Supporting Defendant Adkins's Conviction

-28-

Defendant Adkins asserts that the State failed to prove that she "knowingly neglected" her child. She asserts that because "[t]here were no external injuries that informed Defendant Adkins as to the true nature of the child's medical condition," her conviction can not stand. She claims that her lack of experience, education, and information prevents the conclusion that she knowingly neglected the victim. We respectfully disagree.

The victim, a two-month old infant, could not digest her formula for at least five consecutive days. The victim did not make a bowel movement for at least five days. She was lifeless, displayed jerking movements, and had poor color. The victim slept for excessively long periods of time. Defendant Adkins, acknowledging her awareness of these symptoms, called the physician on the Sunday before the victim's death. The defendants were instructed to feed the victim Pedialyte and, if the symptoms continued, to seek further medical attention. The symptoms continued, but Defendant Adkins, inexplicably, failed to seek medical attention for the victim.

Defendant Adkins's neighbor, Adams, urged her to seek medical treatment for the victim based on the victim's appearance and failure to eat. Defendant Adkins did not do so. The following day, Monday, Defendant Adkins took Lilliana to the pediatrician's office for an annual exam. The victim was also present. Although Defendant Adkins may not have been aware of the victim's exact injuries or how she sustained them, she had the opportunity to have the victim examined and failed to fully disclose all of the victim's symptoms to the doctor or request a medical examination for the victim. Additionally, Defendant Adkins lied to the police about the steps she took toward obtaining medical treatment for the victim.

Based upon these circumstances and the victim's apparent symptoms and signs of distress, a reasonable jury could find beyond a reasonable doubt that Defendant Adkins was aware the victim needed medical treatment and that her failure to seek treatment for the dying victim "adversely affected the [victim]'s health and welfare." T.C.A. § 39-15-401(b).

We also note that Lilliana's medical records show that the defendants had sought medical treatment for Lilliana, then one-years-old, after twenty-four hours of vomiting. This belies Defendant Adkins's assertion that she did not have the experience to identify symptoms in a baby requiring medical attention.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that Defendant Adkins's failure to seek medical treatment for the victim adversely affected the victim resulting in serious bodily injury. The Defendant is not entitled to relief as to this issue.

**B. Admission of Video Recorded Conversation Between the Defendants**

-29-

Defendant Long challenges the trial court's admission of a specific statement made by Defendant Adkins during the course of the recorded conversation between the defendants. Defendant Long asserts that Adkins's statement, "They think you f\*\*king punched her, Russell," is inadmissible hearsay because it is an out of court statement made to the police. He argues that the trial court improperly admitted this statement under the "state of mind" exception to the rule against hearsay. Tenn. R. Evid. 803(3). The State responds that the statement at issue was not offered for the truth of the matter asserted and, therefore, is not hearsay or subject to the Rule 802 exceptions to the rule against hearsay. We agree with the State.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" *State v. Thomas*, 158 S.W.3d 361, 400 (Tenn. 2005) (quoting *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001)). This Court will not interfere with this exercise of discretion unless a clear abuse appears on the face of the record.[2] *State v. Franklin*, 308 S.W.3d 799, 803 (Tenn. 2010). A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is illogical or unreasonable and causes an injustice to the complaining party. *Id*. (quotations omitted).

---

[2] We are aware of the disagreement among panels of this court and also with our Supreme Court regarding the appropriate standard of review of the admissibility of hearsay evidence. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n. 26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at \*3 (Tenn. Crim. App. July 11, 2012) (stating that standard of review for admissibility of evidence is abuse of discretion); *but see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is *de novo* with no presumption of correctness); *Willie Perry, Jr.*, 2012 WL 2849510, at \*7 (Bivins, J., concurring) (applying *de novo* standard of review to hearsay issues). It is not necessary for us to compare the merits of each position because, for purposes of our determination of this issue, the evidence is admissible under either standard of review.

In response to Defendant Long's objection to the videotaped recording of the conversation between the defendants, the trial court initially found that the statement at issue was "clearly hearsay." Upon further discussion, however, the trial court agreed that the statement was not offered for the truth of the matter asserted and was admissible, with a limiting instruction to the jury. The trial court found that the statement was not offered for the truth of the matter asserted but to show Defendant Adkins's state of mind, which was a crucial issue in the case against her. During the jury's viewing of the video recording, the trial court stopped the recording and instructed the jury as follows:

> Ladies and gentlemen, you heard that statement and you might hear statements throughout this thing of her referencing the Johnson City Police Department. I'm letting this document in for one reason and one reason only, and that's her state of mind. And that's the only thing you're to consider it for. Therefore, as - you're not to consider the statement as she just made as a truth of the matter asserted. Its purpose is only to show you her state of mind. This rule does not authorize a statement by her as proof. In other words, this rule does not authorize a statement by the defendant Adkins as proof of another state of mind, that is, the Johnson City Police Department in this case. Therefore, you're not to consider the defendant Adkins what she says about, "They think you punched her," as to the truth of the matter asserted as to this defendant. . . . If it's repeated again ladies and gentlemen, keep understanding it's not for the truth of the matter asserted. She can't say what's in somebody else's mind and that's what she's attempting to do to that.

Defendant Long asserts that the trial court improperly found Defendant Adkins's statement admissible under the state of mind exception to the rule against hearsay. Based upon the trial court's dialogue with the parties on this issue and its instruction to the jury, it is our view that the trial court did not admit the statement under a hearsay exception but admitted the statement on the basis that it was not being offered for the truth of the matter asserted and thus was not hearsay. The trial court's instruction was clear that the jury was not to consider Defendant Adkins's statement for the truth of the matter asserted. If the trial court had admitted the statement under a hearsay exception, as Defendant Long proposes, the statement could have been considered as substantive evidence that the police department thought Defendant Long punched the victim. *See State v. Livingston*, 907 S.W.2d 392, 395 (Tenn. 1995). The trial court repeatedly instructed the jury, however, not to consider the statement for the truth of the matter asserted. Therefore, the record does not support the conclusion that the trial court improperly admitted the recording under an exception to the rule against hearsay.

Further, the trial court did not abuse its discretion when it determined that the statement

was not being offered for the truth of the matter asserted. Although the trial court determined that the statement was relevant to Defendant Adkins's state of mind, the statement was also relevant to the nonhearsay purpose of proving the effect on the listener. *See State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (holding that a statement introduced for its effect on the listener is not hearsay); NEIL P. COHEN ET. AL, TENNESSEE LAW OF EVIDENCE § 8.01, at 8-23 (5th ed. 2005) ("[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair are not hearsay . . . because [the statement] is not used to prove the truth of the matter asserted in the statement."). Upon hearing Defendant Adkins's statement that police believed Defendant Long punch the victim, Defendant Long, crying, dropped his head and in a barely audible tone said, "I didn't punch her, baby." While Defendant Long cried throughout the interaction with Defendant Adkins, his demeanor significantly softened and became more subdued upon the mention of the specific theory under which police believed the victim suffered abuse.

We note, however, that even were we to find that the statement was erroneously entered as the Defendant contends, the error would be harmless in light of the strength of the evidence supporting the Defendant's conviction. *See* Tenn. R. App. P. 36(b).

Accordingly, the trial court did not abuse its discretion in admitting the video recording of the defendants' conversation in its entirety. Defendant Long is not entitled to relief as to this issue.

### C. Admission of Autopsy Photograph

Defendant Long argues that the trial court erred when it admitted an autopsy photograph depicting the victim's skull cap with the skin pulled back. He asserts that the photograph had "very little" probative value and was prejudicial "due to the gruesome nature of the photograph." The State responds that the probative value of the photograph was great because it contradicted Defendant Long's accidental-fall explanation for the victim's injuries. It further asserts that the photograph was specifically cropped so that no other portion of the victim's body or face was visible.

The trial court responded to Defendant Long's objection to the admission of the autopsy photograph, stating:

> [I]t's able to convey to the jury what a doctor is attempting to do through a color photograph they do much better than descriptive. There is nothing objectionable about this. The probative value of this picture far outweighs anything prejudicial about it. Furthermore, it's simply not prejudicial, it's just not and that's the Court's ruling on it. . . . It's just not there, I'm convinced of

-32-

that. That just - this jury can then understand the nature of those - by looking at this photograph, the jury can really understand the nature of the injuries on this child. It's just that simple. She can set [sic] there and attempt to describe them all day. She can hold up the picture and it describes itself.

The determination of the admissibility of photographs lies within the sound discretion of the trial court. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005); *see* NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 4.01[18] [a], at 4-40 (5th ed. 2005). The decision of the trial court to admit a photograph into evidence will not be overturned on appeal absent a clear showing of an abuse of discretion. *Thomas*, 158 S.W.3d at 394. To be admissible, a photograph must be relevant to some issue at trial, and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. *State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004). Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Price*, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000) (citing *State v. Banks,* 564 S.W.2d 947, 951)). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. *Id*.

Autopsy photos should be particularly scrutinized because "they present an even more horrifying sight and show the body in an altered condition." *Id*. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. *State v. Carlos Sommerville*, No. W2004-01083-CCA-R3-CD, 2005 WL 729142, at *4 (Tenn. Crim. App., at Jackson, Mar. 30, 2005) (citing *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995)), *no Tenn. R. App. P. 11 application filed*. Before any photograph can be admitted into evidence, it must be verified and authenticated by a witness with knowledge of the facts. *State v. Jacob Edward Campbell*, No. M2003-00597-CCA-R3-CD, 2004 WL 508477, at *15 (Tenn. Crim. App., at Nashville, Mar. 15, 2004) (citing *Banks*, 564 S.W.2d at 949-50), *perm. app. denied* (Tenn. Oct. 4, 2004).

In the case under submission, the trial court did not abuse its discretion when it allowed the autopsy photograph of the victim's scalp to be entered into evidence. First, we note that the photograph was relevant to the issue of the cause of the victim's death. Defendant Long claimed that the injuries to the victim occurred on the Friday before the victim's death. The photographs were useful to assist the jury to understand Dr. Campbell's testimony and to demonstrate the severity and varying ages of the victim's injuries. The injuries to the victim

were internal, and the autopsy photograph was necessary to show the scope and age of the victim's injuries.

Next, we note that the trial court did not abuse its discretion when it determined the probative value of these photographs was not outweighed by unfair prejudice. This photograph was relevant to prove the cause of the victim's death and was not admitted solely to inflame the jury and prejudice them against the defendants. The photograph at issue is unquestionably unpleasant because it depicts an image of the internal lining of the victim's scalp that was exposed during the course of the autopsy. The primary purpose of the photograph, however, was not to elicit the jurors' emotions but rather to develop facts that were relevant to show how the victim died. Consequently, the trial court did not abuse its discretion, and the Defendant is not entitled to relief on this issue.

### D. State's Use of a Visual Aid During Closing Argument

Defendant Adkins argues that the trial court erred when it overruled her objection to the State using baby bottles as a visual aid during closing argument. She asserts that, in so doing, the State improperly argued facts outside the record. The State responds that its use of visual aids during closing argument was permissible and, therefore, the trial court properly overruled Defendant Adkins's objection.

During closing argument, the prosecutor used baby bottles partially filled with formula to demonstrate the amount of formula, according to Dr. Ledes's testimony, the victim should have been consuming versus the amount of formula that Defendant Adkins said the victim actually consumed. Defendant Adkins's attorney objected, stating that the bottles were not in evidence. The State responded that the bottles were filled with the amounts of formula testified to by Dr. Ledes and in Defendant Adkins's statements. The trial court overruled the objection.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

In *Goltz*, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code Of Prof'l Responsibility DR 7–106(c)(4).

> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See [ State v.] Cauthern*, 967 S.W.2d [726,] 737 (Tenn. 1998); *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6 (quoting Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal). When an appellate court determines an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures

undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

Defendant Adkins asserts that the State attempted to argue facts outside the record when it used baby bottles with formula as a visual aid during closing argument. In our view, the use of these visual aids was not argument "outside the record." The amount of formula the victim had been ingesting was entered into evidence through her medical records and Dr. Ledes's testimony. Dr. Ledes confirmed that this amount, four or five ounces every four hours, was an amount he would expect an infant the victim's size and age to be consuming. Defendant Adkins, in multiple statements, recited how much formula the victim was consuming in her final days. Based on this evidence, the State provided a visual aid to demonstrate the condition of the victim in the week before her death. The amount of formula the victim should have been ingesting daily, according to Dr. Ledes, and the amount she actually ingested, based on the defendants' statements to police, were part of the record. Additionally, the jury was instructed that arguments of counsel are not to be considered evidence. The jury is presumed to follow the instructions of the trial court. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994).

Accordingly, the trial court did not err when it overruled Defendant Adkins's objection to the State's use of a visual aid during closing argument. Defendant Adkins is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE